2021 IL App (1st) 190317-U

FIRST DIVISION
November 5, 2021

Nos. 1-19-0317 & 1-19-0377 (cons.)

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, )<br><br>Plaintiff-Appellee, )<br><br>v. )<br><br>LINCOLN, LTD., an Illinois corporation, f/k/a TRI-STATE INDUSTRIES, an Illinois corporation, JOHN EINODER, an individual, LAND OF LINCOLN DEVELOPMENT COMPANY, an Illinois corporation f/k/a Composting Corporation of America, DONALD P. CLARKE, an individual, LESLIE E. CLARKE, an individual, and VINCENT CAINKAR, an individual, )<br><br>Defendants, )<br><br>(Lincoln, Ltd., John Einoder, Land of Lincoln Development Co., Donald P. Clarke, and Leslie E. Clark, Defendants-Appellants; Village of Ford Heights, Intervenor). ) | Appeal from the Circuit Court of Cook County<br><br>No. 04 CH 12782<br><br>The Honorable David B. Atkins, Judge Presiding. |

PRESIDING JUSTICE PIERCE delivered the judgment of the court.
Justice Coghlan[*] concurred in the judgment.
Presiding Justice Hyman dissented.

_____

[*]Justice Griffin was originally assigned to participate in this case. Justice Coghlan was substituted on the panel after Justice Griffin's retirement and has read the briefs and record on appeal and listened to the recorded oral arguments.

**ORDER**

¶ 1    *Held*:    The circuit court's order for a mandatory injunction improperly imposed retroactive liability on defendants' past conduct. The civil penalties imposed were unreasonable.

¶ 2    This is the third appeal from the parties' dispute regarding liability for violations of the Illinois Environmental Protection Act (415 ILCS 5/1, *et seq* (West 2018)). On appeal, defendants challenge the circuit court's order for a permanent mandatory injunction and civil penalties. For the following reasons, we reverse the judgment of the circuit court and remand for further proceedings.

¶ 3                                I. BACKGROUND

¶ 4    Defendants Land of Lincoln Development Company, Donald P. Clarke, and Leslie E. Clarke (collectively, the "Owner defendants"), own the property in Ford Heights, Illinois, that is the subject of this dispute. Defendants Donald P. Clarke and Leslie E. Clarke are also shareholders of and officers in Land of Lincoln Development Company. Defendant Lincoln, Ltd. is the corporation that managed the dumping of waste at the property. John Einoder is the owner of Lincoln, Ltd. Collectively, Einoder and Lincoln, Ltd. are hereinafter referred to as the "Operator defendants."

¶ 5    The background to this case was extensively detailed in the first two appellate opinions in this case. See *People ex rel. Madigan v. Lincoln, Ltd.*, 383 Ill. App. 3d. 198 (2008) (*Lincoln I*) and *People ex rel. Madigan v. Lincoln, Ltd.*, 2016 IL App (1st) 143487 (*Lincoln II*). Relevant to this appeal, a condensed version of the history of this case follows.

¶ 6    In 2002, pursuant to a written agreement between the parties, Lincoln began dumping clean construction or demolition debris ("CCDD") at a property owned by the Owner defendants in Ford Heights, Illinois. The Operator defendants' claimed purpose for this dumping was to later convert

the property into a snow sports facility. The Owner defendants received a share of the profits from the Operator defendants' dumping operation. The People of the State of Illinois filed this lawsuit in 2004, alleging the defendants' activities violated the Act. In the first appeal, we found the dumping of CCDD was considered "waste" under the Act and Lincoln was required to obtain a permit, and we remanded the case for further proceedings. See *Lincoln I*, 383 Ill. App. 3d 198.

¶ 7       After further litigation in the circuit court, the Owner defendants and the People filed cross-motions for summary judgment on the counts related to the Owner defendants' liability for the dumping of CCDD in violation of the Act. The trial court ruled in favor of the Owner defendants. The People appealed, and we affirmed in part and reversed in part the judgment of the circuit court. *Lincoln II*, 2016 IL App (1st) 143487.

¶ 8       In *Lincoln II*, this court held the Owner defendants were not liable for the violations the Operator defendants engaged in between 2002 and 2007 because the Operator defendants acted contrary to the parties' agreement and because the Owner defendants sought to stop the Operator defendants' activities through enforcement of their contractual rights. *Id.* ¶ 35. Although we "rejected the People's argument that [the Owner defendants] allowed open dumping of waste by failing to prevent or shutdown [the Operator defendants'] operations," we agreed that the Owner defendants were "abandoning or storing waste on [their] unpermitted property by failing to remediate the pollution." *Id.* ¶ 44. Accordingly, we held the Owner defendants were "required to remedy the storage or abandonment" of the illegal waste. *Id.* ¶ 56.

¶ 9       In *Lincoln II*, we "remand[ed] with directions regarding [the Owner defendants'] liability as the owner of currently polluted land." *Id.* ¶ 55. Specifically, we directed the circuit court to

> "(1) order [the Operator defendants] to immediately remediate the property
>
> and (2) quickly conclude the issue of [the Operator defendants'] civil

penalties and fines. In addition, if [the Operator defendants] fails to remediate the pollution in a timely manner, we direct the circuit court to order [the Owner defendants] to take over that task. Ultimately, [the Owner defendants are] fully protected by the circuit court's indemnification order in its favor, which was not appealed. *** We leave any issues regarding the imposition of costs, penalties, and fines against [the Operator defendants] and/or [the Owner defendants] to the circuit court." *Id.* ¶ 56.

The scope of our mandate in *Lincoln II* is disputed by the People and the Owner defendants on appeal.

¶ 10    On remand, the People filed memoranda in support of their request for permanent mandatory injunctive relief and the imposition of fines and penalties against the Owner defendants and the Operator defendants. After briefing, the circuit court ordered prohibitory and mandatory injunctive relief against all defendants requiring the defendants to (1) develop and implement a plan for the removal of all CCDD at the property, and (2) monitor and correct groundwater conditions if necessary. The Owner defendants moved to modify this order in light of our decision in *Lincoln II*. The circuit court modified its order *nunc pro tunc*, directing the injunctive relief to issue against the Operator defendants only. After the Operator defendants failed to implement the circuit court's order, the People moved the circuit court to require the Owner defendants to implement the injunctive relief. The circuit court allowed the motion.

¶ 11    On January 25, 2019, the circuit court entered a final and appealable judgment imposing a $1,800,000 penalty against the Owner defendants and a $6,000,000 penalty against the Operator defendants. The Owner defendants and the Operator defendants each timely appealed, and the appeals were consolidated.

¶ 12                                II. ANALYSIS

¶ 13                             A. Injunctive Remedy

¶ 14    On appeal, the Operator defendants challenge the circuit court's imposition of the mandatory permanent injunction on the grounds that the court applied section 42(e) of the Act to past conduct, in violation of our supreme court's decision in *People ex rel. Madigan v. J.T. Einoder, Inc.*, 2015 IL 117193. The Operator defendants argue that the mandatory injunction ordered by the circuit court involves the retroactive application of section 42(e) because it requires removal of all the waste dumped at the site, without distinction as to whether the waste was dumped before or after the 2004 amendment of section 42(e). We agree.

¶ 15    For the first two years the Operator defendants operated the illegal dumping site, only prohibitory injunctive relief was available under the Act. At that time, section 42(e) of the Act provided that "the Attorney General, may *** institute a civil action for an injunction to restrain violations of this Act." 415 ILCS 5/42(e) (West 2002). Effective July 28, 2004, the Act was amended to state that "the Attorney General, may *** institute a civil action for an injunction, prohibitory *or mandatory*, to restrain violations of this Act *** or to require such other actions as may be necessary to address violations of this Act ***." (Emphasis added.) 415 ILCS 5/42(e) (West 2018).

¶ 16    Our supreme court has held that the amended version of section 42(e) providing for mandatory injunctive relief cannot be applied retroactively to conduct that occurred prior to the amendment of the Act because to do so "would impose a new liability on defendants' past conduct." *People ex rel. Madigan v. J.T. Einoder, Inc.*, 2015 IL 117193, ¶ 36. In *J.T. Einoder*, the court considered the circuit court's order for cleanup of an illegal dump site operated by the defendants between 1995 and 2003. *Id.* ¶ 25. Although the dumping had ceased prior to the 2004

amendment of section 42(e), the circuit court entered a mandatory injunction for removal of the waste. *Id.* ¶¶ 19, 26. On appeal, our supreme found that the amendment to section 42(e) "create[d] an entirely new type of liability —a mandatory injunction—which was not available under the prior statute." *Id.* ¶ 36. Accordingly, our supreme court found that the amended statute could not be applied to the defendants' conduct that occurred prior to the amendment and reversed the circuit court's order for a mandatory injunction. *Id.* ¶ 37.

¶ 17     We find that the circuit court here improperly applied section 42(e) retroactively to the Operator defendants' pre-amendment conduct by ordering the removal of all waste from the property. It is undisputed that the Operator defendants' illegal dumping operation began in 2002, was ongoing at the time of the 2004 amendment, and continued through 2007. The Operator defendants argue that much of the waste was dumped prior to 2004, and the removal order improperly imposes new liability for this dumping. Although the circuit court made no findings on this issue, the record reflects that the waste pile was approximately half its final volume around the time the amendment to section 42(e) became effective on July 28, 2004. Because the circuit court ordered removal of all the waste, without respect to when the waste was dumped in violation of the Act, the circuit court improperly applied the amended section 42(e) retroactively to the Operator defendants' past conduct.

¶ 18     The People argue that the cleanup of the entire site may be ordered for violations that occurred and continued after 2004 because the waste pile is "undifferentiated." We disagree. Consider for example the same set of facts, but that the Operator defendants dumped the waste into two piles, clearly divided based on when they were created, with one pile labeled pre-amendment and the other labeled post-amendment. At oral argument, the People argued liability is premised on the site or location that the waste was dumped, not the waste itself. Under the

People's theory, as long as the waste piles were dumped at the same site, the circuit court could order the cleanup of both piles without retroactively penalizing defendants' pre-amendment conduct. This is not so. Retroactivity would be implicated if the circuit court ordered the cleanup of just the pre-amendment pile. The retroactivity problem is not cured by the circuit court failing to distinguish between the pre- and post-amendment conduct in its mandatory injunction order.

¶ 19     To avoid implicating retroactivity, the circuit court must take evidence on whether the waste pile is indeed "undifferentiated" and whether the Operator defendants' dumping activities can be divided into pre- and post-amendment conduct. If the circuit court is unable to draw a distinction, the circuit court must consider other means of ordering remediation of the site that do not impose new liability on the defendants' pre-2004 dumping. As discussed further below, the circuit court should consider the practicality of ordering a partial cleanup of the property. We therefore reverse the order of the circuit court imposing a mandatory injunction for removal of the waste against the Operator defendants and remand for an evidentiary hearing.

¶ 20     Although the Owner defendants do not challenge the circuit court's application of the current version of the statute to their conduct, our ruling nevertheless affects the mandatory injunction entered against the Owner defendants. In *Lincoln II*, we held the Owner defendants' liability for remediation of the site was secondary to the Operator defendants', and that the Owner defendants should "take over" the remediation ordered by the circuit court in the event that the Operator defendants failed to complete it. *Lincoln II,* 2016 IL App (1st) 143487, ¶ 56. Because we reverse the circuit court's remediation order as to the Operator defendants, we must also reverse the circuit court's subsequent remediation order directed to the Owner defendants.

¶ 21     Both the Owner and Operator defendants also argue that the circuit court erred in issuing a mandatory injunction for the removal of waste from the property without conducting a hearing on

the feasibility of removal as a remedy. The People argue that no hearing was necessary because this court's mandate in *Lincoln II* required the circuit court to issue an injunction for removal of the waste from the property. The People also argue that under *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 277 (2003), the circuit court had no discretion to refuse their requested injunction.

¶ 22    First, we must clarify the scope of our mandate in *Lincoln II*. The circuit court expressed a belief that our mandate in *Lincoln II* required an order for removal of the waste from the property. This interpretation was erroneous. We did not order the circuit court to issue a mandatory injunction for removal of waste from the property, nor did we foreclose the possibility that another form of remediation might be directed by the circuit court. Rather, this court held that "if [the Operator defendants] fail[ed] to remediate the pollution in a timely manner," the Owner defendants were "required to remedy the storage or abandonment of waste on its property by [the Operator defendants] ***." *Lincoln II*, 2016 IL App (1st) 143487, ¶ 56. To the extent we discussed removal of the waste as the contemplated form of remediation in this case, we did not intend on finding removal was the only remedy available. The parties and the circuit court on remand are encouraged to design a remedy that is equitable and attainable within the confines of the law.

¶ 23    Next, we consider the People's argument that the circuit court had no discretion to deny their requested injunction. Under section 42(e) of the Act, the Attorney General is authorized to seek prohibitory or mandatory injunctive relief to restrain or address violations of the Act. 415 ILCS 5/42(e) (West 2018).[1] "An action for injunctive relief under [section 42 of the Act] is not governed by the usual equitable principles for a preliminary injunction." *People v. Mika Timber Co., Inc.*, 221 Ill. App. 3d 192, 193 (1991). "Where, as here, the State or a governmental agency

---

[1]As discussed, a prior version of the Act, in effect until 2004, allowed only prohibitory injunctions to restrain future violations of the Act. 415 ILCS 5/42(e) (West 2004). We have held that any mandatory injunction issued by the circuit court in this case may only be directed to conduct that occurred after the amendment of the statute.

is expressly authorized by statute to seek injunctive relief, the traditional equitable elements necessary to obtain an injunction need not be satisfied. [Citations]." *Cryns*, 203 Ill. 2d at 277. Because the violation of a statute implies injury to the public, the State "seeking the injunction need only show that the statute was violated and that the statute relied upon specifically allows injunctive relief." *Id.* at 277-278. Accordingly, our supreme court in *Cryns* held that "[o]nce it has been established that a statute has been violated, no discretion is vested in the circuit court to refuse to grant the injunctive relief authorized by that statute." *Id.* at 278.

¶ 24     We disagree with the People that the circuit court has no discretion to deny the People's requested order where a statute authorizes injunctive relief. *Cryns* relieves the circuit court of the discretion to decide whether to issue an injunction where an injunction is authorized by statute. However, the circuit court is not required to enter verbatim the injunction requested by the People, without consideration of the appropriateness of the terms and conditions of the proposed order. When issuing an injunction authorized by statute, the circuit court retains its discretion to craft an injunctive remedy that reflects the facts of the case. The circuit court should take evidence and consider commonsense principles of feasibility and proportionality when entering the terms and conditions of its order. We therefore agree with defendants that the circuit court should have conducted an evidentiary hearing on the proposed remedy before entering the injunction.

¶ 25     The People proposed one method of remediation to the circuit court: removal of all the waste from the property. The parties agree that the People's plan will cost $100 million to be implemented over a period of seven years. The Owner and Operator defendants identified several questions as to the practicality of the People's proposed remedy. For example, the Operator defendants argued that they would not be able to contract for the necessary services to complete the removal of the waste because their company is no longer operating or taking in revenue. The

Owner defendants argue that in addition to the financial burden, removal of the CCDD from the property will result in negative environmental effects, such as traffic congestion, air pollution, and groundwater contamination. These concerns must be developed at trial through expert testimony. The circuit court may also require evidence and argument from the intervenor, the Village of Ford Heights, to make its determination as to the best course of action.

¶ 26    The trial court should hold an evidentiary hearing to consider whether another remedy might impose a lesser environmental burden and be more financially viable. After a hearing, the circuit court may in fact find that the People's proposed remedy, modified to address the post-amendment dumping only, is the best course of action to address the violations at issue. But the circuit court may instead find that, in its discretion, it has determined that another type of injunctive remedy is more appropriate. In any event, the parties should be given the opportunity to present evidence on the issue of the appropriate injunctive relief to be issued, and the circuit court should weigh the evidence and exercise its discretion in fashioning an equitable remedy consistent with the facts and the law.

¶ 27    In summary, we find the circuit court was not required to order the People's requested remedy under our mandate in *Lincoln II* or under *Cryns*. Although the circuit court was required to grant the People's request for injunctive relief, the circuit court nonetheless retained the power to hold an evidentiary hearing to consider all relevant matters, including the defendants' arguments regarding the propriety and feasibility of the People's proposed remedy, in constructing the parameters of the injunction. Accordingly, we reverse and remand for the circuit court to hold a hearing on the appropriate remedy to be imposed in this case.

¶ 28                                    B. Civil Penalties

¶ 29    Finally, the Owner and Operator defendants challenge the circuit court's imposition of civil penalties against them.

¶ 30    Section 42(a) of the Act allows for monetary penalties of up to $50,000 per violation and $10,000 per day for each day the violation continues. 415 ILCS 5/42(a) (West 2018). In determining the penalty amount, the court may consider "any matters of record in mitigation or aggravation of penalty," including the statutory factors set forth in section 42(h) of the Act (*id.* § 42(h)). These factors include "the duration and gravity of the violation," any "economic benefits accrued by the respondent" because of the noncompliance, the presence of "due diligence" on the part of the respondent in attempting to comply with the Act, and the amount that would deter further violations and encourage voluntary compliance with the Act. *Id.* The Act requires that the penalty assessed be "at least as great as the economic benefits, if any, accrued by the respondent as a result of the violation, unless the *** imposition of such penalty would result in an arbitrary or unreasonable financial hardship." *Id.*

¶ 31    The penalty "must be commensurate with the seriousness of the infraction for which it is imposed." *Trilla Steel Drum Corp. v. Pollution Control Board*, 180 Ill. App. 3d 1010, 1013 (1989). "However, the Act clearly authorizes the Board to assess civil penalties for violations regardless of whether those violations resulted in actual pollution." *ESG Watts, Inc. v. Illinois Pollution Control Board*, 282 Ill. App. 3d 43, 51 (1996). "The imposition of civil penalties under section 42(a) [of the Act] is discretionary, and such a determination will not be disturbed on review unless it is clearly arbitrary, capricious or unreasonable." *People ex rel. Ryan v. McHenry Shores Water Co.*, 295 Ill. App. 3d 628, 638 (1998).

¶ 32    In its final order, the circuit court found that "[n]otwithstanding the Owner Defendants' early efforts to obtain some compliance by the Operator Defendants," the Owner defendants' violations described by this court in *Lincoln II* have continued since 2007. The circuit court found that the Owner defendants "benefitted at least $1,800,000 from the unlawful operation of the relevant landfill" from royalty payments from the Operator defendants, and that this amount did not include "the benefits derived from avoiding disposal and regulatory compliance costs." The circuit court thus imposed a $1,800,000 penalty on the Owner defendants.

¶ 33    As to the Operator defendants, the circuit court emphasized the scope and duration of the illegal dumping operation. The circuit court found that the Operator defendants "knew or should have known a waste disposal permit was required at all relevant times, but failed to secure one." The circuit court also found that the Operator defendants "received approximately $8,000,000 in dumping fees, from which they paid approximately $1,800,000 to the Owner Defendants and approximately $635,000 to the Village of Ford Heights" not including "disposal and regulatory compliance costs." The circuit court thus imposed a $6,000,000 penalty on the Operator defendants.

¶ 34    We find that the penalties imposed by the circuit court were arbitrary and unreasonable. The circuit court did not ensure the penalty was commensurate with the economic benefit received because the circuit court did not quantify the economic benefit received by the Owner and Operator defendants as a result of the failure to obtain the required permit. We cannot determine from the record before us the precise basis for the circuit court's calculations. Instead, it appears the circuit court relied on the gross revenue figures as a measure of the economic benefit received, possibly with the view that, without a permit, the entire operation was illegal, and the gross revenue of the operation was the total economic benefit to defendants. We find it was error to use the gross

revenue as a measure of the economic benefit to defendants because the dumping operation would not have been illegal at the time if it was permitted and otherwise compliance with the Act. Although it may be difficult to quantify the amount gained by the Operator defendants' failure to obtain a permit, the circuit court should have nonetheless attempted to calculate this benefit with greater specificity.

¶ 35    Furthermore, we do not find that the circuit court properly assessed the duration of the violations. Although it is true some of the violations have continued through the lengthy pendency of the litigation in this case, the delayed resolution is not due entirely to defendants. We do not find that the Operator defendants should be penalized for the delay that resulted from their unsuccessful interlocutory appeal in *Lincoln I*. Similarly, neither the Owner nor the Operator defendants should be penalized for the delay resulting from the People's interlocutory appeal in *Lincoln II*. Nor should the continuation of the violations be considered clearly due to the obstruction of defendants where the People waited three years before obtaining a hearing on their motion for a preliminary injunction.

¶ 36    Finally, we find the record before does not support a finding that the penalties imposed were commensurate with the infractions at issue. The record indicates there has been no dumping at the site since 2007. There appears to be no dispute the material dumped was clean, non-toxic construction debris that posed no environmental threat. By all accounts, the cost of removal appears to be in excess of several million dollars which, when coupled with any assessed statutory penalty, would likely bankrupt defendants. Defendants contend remediation is possible through alternate use of the property consistent with the Act, and this alternate use theory does not appear to have been considered by the circuit court. Ultimately, this case arises from the Operator defendants' failure to secure the proper permit for the disposal of non-toxic waste at the property.

We know of no cases where the penalty imposed approximates the multimillion-dollar penalties imposed in this case. The fact that the penalties fall under the statutory maximum amount does not mean they were reasonably calculated to aid the purposes of the Act as discussed in section 42(h). The compliance goal at issue is for landfill owners and operators to abide by the permitting and regulatory requirements of the Act. A lesser penalty amount would serve this goal without being unduly punitive and excessive.

¶ 37    We therefore find that the penalties ordered against the Owner and Operator defendants by the circuit court are not supported by the record in view of all the relevant circumstances surrounding the underlying circumstances of the statutory violations and available alternative remediation remedies available and therefore were unreasonable. We remand for the circuit court to conduct a hearing on the civil penalty, if any, to be imposed on both sets of defendants.

¶ 38                                III. CONCLUSION

¶ 39    For the foregoing reasons, the judgment of the circuit court is reversed. This case is remanded for the circuit court to conduct a hearing on the remedy and penalties to be assessed against defendants.

¶ 40    Reversed and remanded.

¶ 41    PRESIDING JUSTICE HYMAN dissenting:

¶ 42    The trial court followed precisely what the decision in *People ex rel. Madigan v. Lincoln, Ltd.*, 2016 IL App (1st) 143487 (*Lincoln II*), instructed—to order defendants to remove the waste they had been illegally dumping and maintaining since 2002, and to impose civil fines on both defendants.

¶ 43    Yet, the majority concludes that the trial court misinterpreted *Lincoln II* and improperly applied the Act retroactively by ordering the removal of the waste pile. The majority then nullifies

14

the trial court's actions and orders a "do-over" on both the appropriateness of the injunction and fines.

¶ 44    The majority has not only evaded the holding in *Lincoln II*, but also ignored the Act's plain language. And the majority subverts the law-of-the-case doctrine. So, I respectfully dissent.

¶ **45**    I also dissent from the majority's choice of designating the decision as a written order. The majority's reasoning squarely falls within the mandate for publication as an opinion under Supreme Court Rule 23(a). Ill. S. Ct. Rule 23(a)(1) (eff. Jan. 1, 2021) (listing criteria for publication including "establish[ing] a new rule of law"). Now that Rule 23 permits citing written orders "for persuasive purposes," I believe Rule 23(a) should allow publication as an opinion whenever a single panel member determines the criteria have been met.

¶ 46                          Retroactive Application of the Statute

¶ 47    The majority finds the trial circuit court improperly applied section 42(e) of the Act retroactively by ordering defendants to remove all of the waste dumped at the site instead of limiting removal to the waste dumped after the Act's 2004 amendment. *Supra* ¶ 17. The majority rejects the State's argument that the trial court could order cleanup of the entire site for violations that occurred and continued after 2004 because the waste pile is "undifferentiated."

¶ 48    To reach its ultimate conclusion, the majority presents a hypothetical that had the operator dumped the waste in two distinct piles—one containing only pre-2004 waste and one containing only post-2004 waste—the trial court could not order the removal of the pre-2004 waste without implicating retroactivity. A hypothetical, however, should not be used to make inferences on a wholly different set of facts. The record establishes an undifferentiated pile of waste, thus the hypothetical on which the majority heavily relies, is irrelevant.

15

¶ 49    Furthermore, remand is not required to address whether removing the entire pile would involve applying the Act retroactively—that issue already has been decided by the trial court. The majority concentrates on the State's contention that under *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 277 (2003), the trial court had no discretion to deny the request for an injunction when, as here, a statute authorizes an injunction. *Supra* ¶ 24. The majority asserts that *Cryns* only relieves the trial court of the discretion to decide *whether* to issue an injunction and does not remove the trial court's discretion to have an evidentiary hearing on the propriety and feasibility of the State's proposed remedy. *Supra* ¶ 27.

¶ 50    Leaving aside that discretion to hold a hearing before issuing the injunction implies the discretion not to hold a hearing, the trial court did conduct a hearing before entering its order. The State addressed the issue in its memorandum in support of the motion for permanent injunctive relief to which the defendants responded making the same arguments they make here. Thus, defendants had the opportunity to argue that the pile was differentiated and that partial removal would serve the Act's purposes. After considering the positions for and against injunctive relief and the evidence presented by the parties, the trial court ordered defendants to remove the waste.

¶ 51    *People ex rel. Madigan v. J.T. Einoder, Inc.*, 2015 IL 117193 is plainly distinguishable. As the majority notes, in *Einoder*, our supreme court held that section 42(e) could not be applied retroactively and vacated the trial court's mandatory injunction ordering defendants to remove any and all material deposited above grade at the site. But in *Einoder*, the defendants ceased their dumping activities in 2003, before the 2004 the legislature amended section 42(e). The supreme court found that because the legislature had not expressly indicated an intent regarding the temporal reach of the amended statute, it is presumed not to apply retroactively. *Id.* ¶ 34. So, the trial court could not order the removal of waste that had all been dumped *before* the amendment.

¶ 52    Conversely, defendants dumped waste on the site until 2007, four years after the statute was amended, making it impossible to differentiate between waste dumped on the pile before and after the amendment. Unlike *Einoder*, the trial court's order did not increase defendants' "liability for past conduct, or impose new duties with respect to transactions already completed." *Einoder*, 2015 IL 117193, ¶ 30. Instead, the court applied the appropriate remedy for illegal dumping that continued long after July 2004. See, e.g., *Tri-County. Landfill Co. v. Illinois Pollution Control Board*, 41 Ill. App. 3d 249, 257 (1976) (holding application of Environmental Protection Act not retroactive because landfill company had been adding refuse to landfill after Act's effective date).

¶ 53    The majority's finding of retroactive application appears to lie solely on its conclusion that the trial court "ordered removal of all the waste, without respect to when the waste was dumped ***." *Supra* ¶ 17. Not so. On remand, the defendants stipulated they dumped about half of the waste before the 2004 amendment and half after. Both parties presented arguments to the trial court about whether requiring removal of the entire pile would constitute retroactive application. The trial court concluded, based on the facts and law, that the entire pile must be removed. Remanding for another hearing serves no purpose other than rehashing issues the trial court has already addressed and causing further delay.

¶ 54                    Feasibility of Removing Pile

¶ 55    The majority also contends the trial court erred in failing to hold a hearing on the feasibility of removing the waste pile. According to the majority, the trial court interpreted this court's mandate in *Lincoln II* too broadly. Specifically, the majority asserts the trial court's finding that *Lincoln II* required removal of the waste was "erroneous." *Supra* ¶ 22. The majority quotes the court's statement in *Lincoln II* that the "owner of the Ford Heights land, is required to remedy the storage or abandonment of waste on its property by Lincoln in violation of section 21(e) of the

17

Act." But, the next sentence, which the majority neglects to quote, states, "Mindful of the primary purpose of the Act, which the General Assembly specified is to assure that 'adverse effects upon the environment are fully considered and borne by those who cause them' (415 ILCS 5/4/(b) (West 2002)), we direct the circuit court to now (1) order Lincoln to immediately remediate the property and (2) quickly conclude the issue of Lincoln's civil penalties and fines."

¶ 56    This court directed the trial court to order defendants to "remediate the property," to contend otherwise would be to reject the *Lincoln II* court's direction and result and substitute its own. This the majority has no authority to render. *Gillen v. State Farm Mutual Automobile Insurance Co.,* 215 Ill. 2d 381, 392 n.2 (2005) (appellate court free to part company with appellate court decision with which it disagreed, but, as a court of equal dignity, it had no authority to abrogate that decision).

¶ 57    The majority suggests, however, that "remediate" may mean something other than removal and that "[t]o the extent we discussed removal of the waste as the contemplated form of remediation in this case, we did not intend on finding removal was the only remedy available." *Supra* ¶ 22. Defendants raised the same argument in the trial court.

¶ 58    In rejecting it, the trial court noted that the *Lincoln II* court stated, "[i]t cannot be said that the continuation of litigation permits an owner of land to indefinitely postpone and thereby allow waste to remain on its property and not be obligated to remove waste should another responsible party not do so." *People v. Lincoln, Ltd.*, 2016 IL App (1st) 143487, ¶ 55. Beyond question, this court ordered LLDC to remove the waste from the site if Lincoln failed to do so.

¶ 59    The court contemplated no other remedy in *Lincoln II,* and the trial court ordered that remedy after briefing. Accordingly, no reason remains to remand for another hearing on the same issue.

¶ 60                                    Civil Penalties

¶ 61    The majority concludes the civil penalties imposed were "arbitrary and unreasonable." They were neither and should be affirmed.

¶ 62    As the majority notes, section 42(a) of the Act allows for monetary penalties of up to $50,000 per violation and $10,000 per day for each day the violation continues. 415 ILCS 5/42(a) (West 2018). In determining the penalty amount, the court may consider "any matters of record in mitigation or aggravation of penalty," including the statutory factors set out in section 42(h) of the Act (*id.* § 42(h)). These factors include (i) "the duration and gravity of the violation," (ii) "economic benefits accrued by the respondent" because of the noncompliance, (iii) the presence of "due diligence" by the respondent in attempting to comply with the Act, and (iv) the amount that would deter further violations and encourage voluntary compliance with the Act. *Id.*

¶ 63    After extensive briefing, the trial court imposed a $1.8 million fine on the owners and a $6 million fine on the operator. Based on the amount of money each defendant earned through the illegal dumping, these fines prevent them from retaining the economic benefit of their illegal activity, as permitted under section 42(h). Moreover, these amounts reflect the duration of the violation, which as of today, approaches two decades. Further, the amounts fall well below the section 42(a) limits while sufficiently serving as a deterrent to potential violators.

¶ 64    The majority takes issue with the trial court's use of defendants' gross revenue in calculating the civil fines, finding that it fails to "ensure the penalty was commensurate with the economic benefit received." *Supra* ¶ 34. The operator similarly argues the trial court should have at least considered costs. But, as this court held in *People ex rel. Madigan v. Einoder*, 2013 IL App (3d) 113498 ¶ 74 (*rev'd on other grounds*) "there is no requirement under the Act that penalties imposed bear a mathematical relationship to the net profits realized by virtue of the violations

charged. Indeed, this approach could encourage potential violators to simply factor in the estimated penalty to the cost of doing business, thus defeating the dual purpose of the imposition of penalties, which is to punish violators and discourage other similarly situated parties from engaging in prohibited conduct."

¶ 65    Further, as in *Einoder*, "[i]f defendants wanted the trial court to consider evidence that net profits were substantially less than the reasonable estimate of gross profits provided by the State, nothing precluded defendants from presenting that evidence, which was readily available to them." *Id*. That evidence could have been offered to the trial court. Instead, the majority has gifted a proverbial second bite at the apple.

¶ 66    Moreover, the fines need not be exactly commensurate with the economic benefit defendants received from the illegal dumping, as the majority appears to suggest. *Supra* ¶ 34. In its order, the trial court stated that the operators "received approximately $8,000,000 in dumping fees, from which they paid approximately $1,800,000 to the Owner Defendants and approximately $635,000 to the Village of Ford Heights." The court noted that neither amount included the benefits derived from avoiding disposal and regulatory compliance costs. In assessing fines of $6 million and $1.8 million, the trial court considered not only the economic benefits received but also the duration of the violations and deterrent effect. That the fines do not reflect the exact amounts the defendants gained by failing to obtain a permit is not a basis for reversing the order. 415 ILCS 5/42(h) (West 2020) ("In determining the appropriate civil penalty * * *, the Board shall ensure *** the penalty is *at least* as great as the economic benefits, if any, accrued by the respondent as a result of the violation"). See, *e.g.*, *Toyal America, Inc. v. Illinois Pollution Control Board*, 2012 IL App (3d) 100585, ¶ 37 (finding $716,440 civil penalty supported by regulatory mandate that penalties be at least as great as economic benefit accrued from violations, which was $316,440,

where violations were ongoing for 8 years and manufacturer failed to determine what requirements applied to it or to timely achieve compliance).

¶ 67    The majority's finding that the trial court did not properly assess the duration of the violations also lacks merit. Almost immediately after the dumping began in 2002, the Illinois EPA sent violation notices to the property owners. After the State filed this lawsuit against defendants in 2004, the property owners sent a letter to the operators ordering they cease operations. Yet, the dumping continued for four more years, and both parties continued to earn money from the operation. This distinguishes them from other violators who attempted to remedy their violation and received a lesser penalty. See *e.g.*, *Standard Scrap Metal Co. v. Pollution Control Board*, 142 Ill. App. 3d 655, 662 (1986) (defendant violator applied for and was granted permit after suit filed against it); *People ex rel. Ryan v. McHenry Shores*, 295 Ill. App. 3d 628, 638 (1998) (after receiving enforcement letter from Agency, defendant made some attempt to remedy violations).

¶ 68    The majority does not dispute that the defendants violated the Act for years and profited considerably. Instead, the majority appears to deem defendants' failure to obtain the required disposal permit for the disposal of non-toxic waste as a relatively insignificant infraction not warranting the civil fines the trial court imposed. But, as the majority acknowledges, "the Act clearly authorizes the Board to assess civil penalties for violations regardless of whether those violations resulted in actual pollution." *ESG Watts, Inc. v. Illinois Pollution Control Board*, 282 Ill. App. 3d 43, 51 (1996). *Supra* ¶ 31. Under the Act, the trial court has broad discretion when imposing civil penalties, and we will not disturb the court's decision unless it is plainly arbitrary, capricious, or unreasonable. *McHenry Shores Water Co.*, 295 Ill. App. 3d at 638. The fines the trial court imposed reflect the seriousness of the violations, which continue to this day, and support

the legislature's focus on deterrence and mandate that penalties prevent violators from retaining economic benefits. See 415 ILCS 5/42(h) (2018).

¶ 69    Again, the majority's finding foils the Act's remedial scheme and undermines the trial court's proper exercise of its discretion.

¶ 70                                   Designation as a Rule 23 Order

¶ 71    I disagree with the issuing of this decision as a written order. I have made this point before, see *People ex rel. Alvarez v. $59,914 United States Currency*, 2020 IL App (1st) 190922-U, ¶ 51 (collecting cases) and, most recently, in *People v. Hollie*, 2021 IL App (1st) 192222-U. I hold firm to these arguments.

¶ 72    Rule 23(a) allows for publication when a majority of the panel concludes that a decision either "establishes a new rule of law or modifies, explains or criticizes an existing rule of law" or when "the decision resolves, creates, or avoids an apparent conflict of authority within the Appellate Court." Ill. S. Ct. Rule 23(a)(1)-(2) (eff. Apr. 1, 2018). As I explained in discussing the merits, the majority "establishes a new rule of law" by holding that the trial court applied section 42(e) retroactively by ordering defendants to remove undifferentiated waste they dumped before and after the Act was amended.  Thus, Rule 23(a) mandates designating this decision as an opinion.

¶ 73    Moreover, the majority explains existing law by holding that a trial court should first conduct an evidentiary hearing before granting injunctive relief authorized by statute. In *Cryns*, our Supreme Court held that when a state or governmental agency is expressly authorized by statute to seek injunctive relief and it has "been established that [the] statute has been violated, no discretion is vested in the circuit court to refuse to grant the injunctive relief authorized by that statute." *Id.* at 278. Under the majority's holding, however, the trial court should first hold an evidentiary hearing to consider whether "another type of injunctive remedy is more appropriate"

than the one the State requested. *Supra* ¶ 26. Holding an evidentiary hearing, as the trial court did here, may be necessary, but the majority cites no other cases that have similarly interpretated *Cryns*. So, publication is warranted.

¶ 74     In its present form, Rule 23 stymies rather than encourages issuance of an opinion; the agreement of two justices dictates precedential value. Though usually unanimous, disagreements on satisfaction of the Rule 23(a) criteria have arisen from time to time when there is a dissent or a concurrence, both of which hold a vital and positive role in modern appellate decisions.

¶ 75     To avoid the same problem that occurred when a majority could decide whether to hold oral agreement, the determination of one panel member the decision meets the requirements of Rule 23(a) should suffice. See Ill. S. Ct. Rule 352(a) (eff. July 1, 2018) ("oral argument shall be held in any case in which at least one member of the panel assigned to the case requests it.").

¶ 76     A dissent, said U.S. Supreme Court Justice William J. Brennan Jr., "safeguards the integrity of the judicial decision-making process by keeping the majority accountable for the rationale and consequences of its decision." Melvin Urofsky, *Dissent and the Supreme Court: Its Role in the Court's History and the Nation's Constitutional Dialogue*, Vintage Books at 425 (2017). An opinion achieves that safeguard far better than an order.